Welcome you here today. We have a varied docket this morning for sure, and we assume that most of you are familiar with our procedures, but just to double check, we have the traffic light system. I see that in the first argument, we have split representation for the defendants, but you will get a yellow light that signals you have two minutes left. When the red light comes on, we ask you to conclude your remarks as quickly as possible. Also, we appreciate record citations, since we may not have, probably won't have read the entire record before coming to oral argument. First case of the day is number 1840521, United States v. Diggles. We'll hear from Mr. Ross first of all. Kevin Ross Good morning. May it please the Court, my name is Kevin Ross. I represent Anita Diggles. The issue in this case regarding Anita is whether or not the evidence is sufficient to support the conviction for conspiracy to commit wire fraud. Ms. Diggles was the director of the 21st Century Learning Center. This center provided youth services for at-risk kids, where they provided services such as mentoring, teaching, meals, transportation for kids, as well as recreation. Ms. Diggles, as a director, put together reimbursement packets that were submitted to what I refer to as the foundation, that received federal funding through DETCOG, Deep East Texas Council of Governments, that had received federal funding. In regards to hurricane relief funds that were distributed. Now, the government's position in this case, as well as the jury had found, that Ms. Diggles was a part of this conspiracy because she overbilled, she inflated, instead of what the actual costs were for teachers, for transportation, and things of that nature. I think the evidence supports the fact that Ms. Diggles, in submitting the reimbursement packets to the foundation, consistently applied the unit costs for those services that had been agreed to in contractual terms through the agencies that were funding this. Now, there is no dispute in this case that services weren't rendered, that teachers weren't paid, that there were an inflation of students or transportation. The only issue in regards to Ms. Diggles is the fact that the government states that she should have been billing actual costs rather than submitting packets for unit costs. Isn't that the presumption in most government contracts? Your Honor, that very well may be. However, Ms. Diggles was not the person who negotiated these contracts. Walter Diggles was more involved with that. The problem, I think, in one sense is possibly the transferred relationship aspect here of Walter Diggles as Ms. Diggles as Anita's father. And so there's this idea of, well, maybe she should have known what her dad was doing. But the fact of the matter is that her sole responsibility was just with this learning center, and she has been given these unit costs to bill against, and that's what she does. And so when she submits those reimbursement packets, those are also checked by the financial department and the foundation, and it goes up and they are checked through the DTCOG, and they were all approved. Ms. Diggles, Anita, did not have any workings or involvement with that process of the foundation or DTCOG. She simply did her job. And so the argument here is that did she have knowledge? Well, she had knowledge that she was billing $50 to $75 an hour for everybody and paying them $10 to $16. Exactly, Your Honor. And it's not disputed. And what was happening to the additional funds? Well, then there lies the question in regards to Ms. Diggles herself. Did she receive funds to pay for personal expenses through the church ministry there? She did. I mean, there's no question about that. I guess the argument, though, is when you look at what was her intent, did she intend to defraud, what was her knowledge as far as whether she was supposed to be billing unit costs versus actual costs, she was a director. She followed the instructions that she had been given. She's not a negotiator. She didn't negotiate these contracts. She wasn't privy to what the rules and the regulations were. She saw that this is what you were supposed to bill based on unit costs for teachers, for transportation and things of that nature. That's what she did. And then when she was interviewed by the agent, the agent's testimony was that Agent Munoz really believed that what she was doing was okay. And there's not an intent there to defraud. There's not a knowledge of an agreement with the other parties. Anita was not a child. She was in her 30s. She is in her 30s, right? Yes, Your Honor, but I'm saying that she is not someone who, again, was privy to government regulations in the contract negotiations for the unit costs. To her knowledge, she was billing based on a unit cost, and that unit cost was approved throughout the process. I just don't believe that the facts of this case, she was only charged in one count. You made that same argument to the jury. I understand, Your Honor, but I think that when you have a conspiracy, a conspiracy is a wide net. And when you have multiple defendants in the case, jurors may tend to look at the overall rather than a three-court panel looking at the specifics to see if, in this particular case, with this particular defendant, looking at the evidence, even in light most favorable to the verdict, does it show that she had the requisite intent to commit fraud? And does she have knowledge of the agreement to suffice for the elements of conspiracy? And I would argue to the Court that it's just not there when you look at her individually, specifically. Didn't she, did they give her a deliberate indifference, deliberate ignorance instruction? Your Honor, I do not recall. Okay. Well, I'm not sure that it was mentioned in the briefs. I was just wondering because didn't some of the testimony say that she knew that some people around town had said your daddy may be a crook? There was testimony that that was rumored in town. But again, to her, though, that's, I don't believe that you have the inference that that can create the intent to defraud or that that can create knowledge of an agreement to help defraud in the issue of the conspiracy. Well, if she weren't the daughter and she were just an independent employee, then it seems to me the jury could have inferred that there would be reason to be suspicious. Suspicious, but does that rise to the level of sufficiency to convict? Well, and when it goes on for a couple of years, maybe. Well, Your Honor, I see that my time is dwindling down. Yes, sir. Thank you. All right. This was a joint trial. She was tried with all the others. That's correct, Your Honor. Did you move for a severance? I don't believe that there was, Your Honor. I was not the trial attorney. Okay, Mr. Bailey. Thank you, Your Honor. May it please the Court. My name is Don Bailey. I'm representing Rosie Diggles. There's two issues I would like to bring to the Court's attention. The first is located in the record at 3853 to 3864. It concerns the misrepresentation issue on sentencing guidelines, and there is somewhat of a disconnect in what's put in the sentencing guidelines versus what's in the notes to the sentencing guidelines, because what the sentencing guidelines says is it's got to be a misrepresentation that the defendant was acting on behalf of a charity. But one of the examples that's given in the application notes is a person that's not misrepresenting themselves. That's a fire chief who solicits funds for a new fire engine but uses some of that money for his own personal purposes. So that's not misrepresentation. So there's a slight disconnect between the application notes and what's actually in the sentencing guidelines. And that's what I would like to focus on. Isn't that a misrepresentation? I mean, he's misrepresenting that the funds are going to the fire department, but in fact they're being put in his pocket. No, Your Honor. Specifically, the sentencing guideline says that it's got to be that the defendant was acting on behalf of a charitable, educational, religious, or political organization. Right. And the fire chief says give money to the fire department. He says he's acting on their behalf, and people give money, and instead he puts it in his pocket. Yes, sir. I'm trying to understand why that's not a misrepresentation. It's a misrepresentation. He lied that he was raising funds for the fire department. Well, that's where the Tenth Circuit says that it's got to be the intent of what the purpose of the solicitation of funds is. But the specific argument that I made was regarding the solicitation of funds. In all three examples in the application notes, there has to be solicitation. There has to be some going out there trying to get funds. And there was no evidence in the record that Rosie Diggles ever solicited any funds on behalf of either the Heart to Heart Foundation, the church, or the learning center. So I don't think that there is sufficient evidence for Judge Clark to have found that there was a misrepresentation in this case. Now, the way it was presented to the Court was specifically on misrepresentation. The way I presented it in this appeal was not only misrepresentation, but the solicitation that there was. Are you saying she's the one who actually has to have made the solicitation even? It doesn't count if she's part of a conspiracy? It's not broad as the solicitation doesn't say it's part of a conspiracy. But the general sentencing guideline principles mean you're responsible for relevant conduct of anyone in your group, you know, if it has to be foreseeable and all that. But you know the basic principles. Yes, that's correct, Your Honor. But I believe that the sentencing guidelines is specific to that defendant. And so when the Court focused on the third example, it requires soliciting the fire chief, she never solicited funds. Now, what the Court relied upon, and that's in the record on 7095, was paragraph 17 in the PSR. And what paragraph 17 in the PSR is a conglomerate of activities attributable to Anita and Rosie Diggles. It doesn't specifically break those out. I don't think there's any evidence that Rosie Diggles ever solicited any funds. What Rosie Diggles did in this conspiracy, or what the evidence at trial was, is she cooked, she drove the bus, she was a cosigner on an account once they found out they needed a cosigner on an account, and she set up the Hart-Tart Foundation. So based upon that, I don't think the two-level increase. Do you agree this is a plain error review? I brought it as that. The reason is, is because it's not specifically brought as a misrepresentation. It's based upon the solicitation. I think it could be brought under either issue, but I think it fulfills the plain error requirement. Okay. And what about the fact that she's a co-conspirator? Doesn't that affect the treatment, the sentencing treatment here? I don't. My view is it does not. But you can certainly disagree with me. But in reading the different cases, I don't think that she's responsible for misrepresentation of other people. Well, no. But other people, she is a conspirator with other people who are responsible for misrepresenting. I'm sorry to interrupt. That would have to be an agreement that she agreed to misrepresent. She never agreed to misrepresent or that she agreed to solicit. Her job was cooking, driving a bus, and ‑‑ Driving a Cadillac Escalade. Well, that was her regular car. And her husband made $160,000 a year. Paying her phone bills with a credit ‑‑ using the church credit card for all sorts of personal expenses. And Walter Diggles testified that that was reimbursement for different things that they had had to pay for up front. Did they introduce any evidence that the Board of Elders or deacons or whatever they were had approved such payments and reimbursement? No, Your Honor. And I will submit, I'll admit that the entire church was made up of mostly the Diggles family. But there wasn't a specific record about that. Okay. Okay. The second question, and Ms. Peraz has covered this to a large extent, is insufficient evidence. And I would just ‑‑ I've already told you that she's, you know, that what she did was cooking and she taught class. She was a former accountant. She was a bright lady. She still is a bright lady. Where in East Texas is this located? Detcog? It's in Jasper somewhere, I understand. Jasper? That's the way I understand it. I didn't try the case, but that's the way I understand it. And I think everything was in relative relation to Jasper, Texas. And with regards to the Count One conspiracy case and also the wire fraud case, what the government says in their response is that you can infer, based upon her mere presence, that she committed wire fraud and she committed conspiracy to commit money laundering. And I've cited to the court the United States versus NATO that specifically says you cannot use an inference based upon mere presence as a basis for conviction on those issues. And depending on your questions, that's all I have. Okay. Well, thank you. Thank you. We have time for rebuttal. All right. Mr. Oestreicher. May it please the Court. I'm Stephen Oestreicher on behalf of the United States. Just to start with, Judge Jones, your question about whether there was a deliberate ignorance instruction in this case, there was, and that's at page 334 to 335 of the record. I think that's an important instruction for both Rosie and Anita Diggles because, yes, they weren't the ones who were present at every single entity like Walter Diggles was. But, for example, in Anita's case, the easiest way for us to prove a defendant's knowing participation in this scheme is to show, as we've kind of put it in our brief, both sides of the ledger. So in Anita's case, it's a very easy shortcut to figure out what she knew, A, what was being represented in the paperwork by the Foundation because she was the one putting together the paperwork. That listed the teacher's costs at $72.96 and $110 an hour. And at the same time, she has these, you know, for example, she put together a spreadsheet that listed that they were getting paid $8 to $15 an hour. Katina Boykin testified that Anita was the one who authorized those teachers' rates of pay. I have a question about the math. You point to these instances of extreme overbilling, you know, sometimes eight times the actual cost or so. But then when you look at the loss in the case, it's less than, it's not even double. It's close to double. But why is there such a disconnect? It looks like they were getting eight times the money, but then they end up getting hardly double the money. I'm not sure. I think it may be that in some packets they just weren't misrepresenting to the same extent. I think the main, if there's a question, I think the question lurking behind that is, did these teacher expenses, did the listed teacher expenses, did that cover some other things like, you know, meals for the children or something like that? And I think the answer to that is no, because in that paperwork, in the reimbursement paperwork, it listed separately, you know, rent to the church. It listed meals for the children. And, of course, the transportation. It looked like part of it was they might have not been billing as many hours. They were billing a much greater rate, of course. But it seems like some of the math is that they weren't billing. They actually worked more hours than they were billing. Right. I think that's just got to do with lack of careful paperwork. I know there is that example in Walter's brief, and we don't dispute that, that in that one instance, for example, it was I think Laura Forward was one of the teachers. So there the overbilling was over, you know, it was only to the tune of $25 an hour or something like that. And there may have been more examples like that. But the defendants have never directly confronted Agent Goodson's testimony about what the total was. I mean, he walked through these things packet by packet. I think the question is, could the jury have credited that testimony in light of the documentary evidence? And I think the answer is yes. I have a question about the basic program. Did all these services have to be for hurricane victims or evacuees? I mean, you have 2010, this financial literacy program. I guess I can see if the financial literacy program is for people who were, you know, lost their homes because of the hurricane and needed to get their finances in order. But did there have to be that? Were the people coming to the financial literacy program hurricane victims? It doesn't seem like your case is really based on these recipients not being victims. I think they do have to be hurricane-related expenses because of the representations that Walter made. So there's two levels of falsification in this case, one from the foundation to DETCOG, then there's that next level from DETCOG to the Texas Health and Human Services Commission. And Walter used two different – and he certified every single reimbursement from, you know, from Texas Health and Human Services to DETCOG. He certified that the – I think the words were that all outlays were for the purposes set forth in the award documents, quote, unquote. The award documents were hurricane relief award documents, and the purposes listed therein were, yes, a number of different services, but services for hurricane relief. And I think there was testimony from Danielle Sells and Shanna Fuller, the two SSBG program heads at DETCOG. I think they testified specifically that this was supposed to be for hurricane relief. So I don't – But your fraud allegation is not – I didn't see an allegation that the recipients weren't hurricane victims. No. It seems to me I'm not sure – That's right. Five years after Katrina, who's determining if these people were victims or not that were coming to the church? Right. I think it's – I don't think it turns on that. I mean, I think it's strictly – it really is an overbilling case, and I think it's – we can establish the wire fraud that way, this gap. So I think the district court summarized it really well in the Rule 29 conference, and you'll see this at 3432. Help me a little bit with what the design for auditing the government had in place, if any. Sorry. Was there any program whereby the government would audit and monitor the monies that were going out the door here? I don't – in the record, I don't think that there was. How was this exposed? To be honest, I don't know. I think at some point – at some point it just became so brazen. I'm not entirely sure how the investigation got started. I know Agent Goodson was investigating. Well, at some point it became – the same practice throughout. It wasn't that it became so brazen over time. On its face, it doesn't make sense. Right. And I – it's unfortunate that it took as long to discover as it did, and that's, I think, the point – I think the point Judge Jones was getting at, too, was why – Well, I guess there's no contributory negligence to a conspiracy charge, but the government just opens the door and hands out the money. You don't have a lot of patience with the government, but neither here nor there. Well, I think I would say, too – Let me move to something that may be a little more constructive. The problems of the conditions that were imposed by the district court that are challenged here, how did that happen? I think that was a – because this was before Rivas-Estrada, I think this was a standard practice in the Eastern District Court. And what was your standard practice? The standard practice was just to list the recommended conditions in the pre-sentence report. Or not the standard. But then with no interrogation by the judge as to whether or not they've read it or anything and understand it? Well, I believe the question was asked in this – well, I'm not sure if the question was asked in this case. I think the general practice is the district court says, and have you had a chance to read the pre-sentence report with your client and so forth. I think that – I'm not entirely sure whether that happened. It says that the district court stated on which pages of the PSRs the special conditions could be found. That's correct. Although it did do that, and I would acknowledge it did do that as it was imposing the conditions. But why do you concede error here? I think Rivas-Estrada is very similar to this case. Do you agree to say that the district judge has got to read orally to the defendant standing in front of him? Unfortunately – and we don't agree with Rivas-Estrada. That's the very point he made. Well, I didn't ask you that. Well, do you agree with it or not? You have a view that the district judge is required to go through 12 conditions, which may or may not be relevant, and interrogate the defendant about them in open court, rather than with – he's got a court-appointed lawyer and he's got a PSR that they've read, and why isn't it sufficient for the district judge simply to say to them, pointedly, whether or not you have examined this report and so forth? And that's the very point we made in the petition for rehearing in Rivas-Estrada. I would say there is – Well, I'm not – I'm trying to zero in on the question of what we really mean by the district judge is required to personally direct them. Do you have to orally recite them? Because I suggest to you that turns this condition, the relationship between the district judge, the sentencing judge, and the person in front of him, upside down. Because he's got to sit there and say, I've got to read you these 13 things and go through them. It really frustrates the central purpose of communicating with a defendant. And I'm pushing you a little bit here because I'm surprised that the government would so quickly relent on this. Well, I think without backing away from our concession, I think we agree with you about the underlying problem with Rivas-Estrada for that reason. There's also United States v. Rulon – I don't know if I'm saying that correctly – Rulon that predated Rivas-Estrada. In that case, there was slightly different facts. And a way that maybe this could be procedurally handled is laid out in that case where the government just moves to introduce an exhibit at sentencing that has all the conditions in it. And if the defendant says right then and there, I've read these and I don't have any objection to them, I think that is still fine after Rivas-Estrada. Rivas-Estrada distinguishes Rulon. So I think that procedure is still available. There are other arguments we could have made in this case about whether these were all quote-unquote special conditions that are subject to the Rivas-Estrada rule. I think because for us it was much more important to – we were running out of space, frankly, when it came to the sufficiency of the evidence with three defendants. Well, you know when the assistant United States attorney is standing there, he's not just a noggin or a log. The district judge fails to, in the business of sentencing, to engage them. It's perfectly proper. And I certainly would, as a district judge, would want to say, Judge, I don't believe you addressed the defendant with regard to these matters and so forth. But the assistant United States attorney apparently didn't say anything. Again, I think because this – it just wasn't known to us at the time that it was not fine to have, as Your Honor pointed out, the pre-sentence report months in advance listed the special conditions. And again, because this predated Rivas-Estrada, I think our practices will now change a bit. Well, there's also – I've seen a recent case from the Northern District of Texas where the judge had a written document at sentencing of the conditions and asked the defendant to sign it after, you know, reviewing it and confirming knowledge with their attorney. And I think that could be distinguishable from Rivas-Estrada, too, because the whole idea behind it is really the presence. The defendant is entitled to being present at sentencing and present, you know, to engage on the special conditions. And I think that would be safe. And have a chance to object, knowing what they are. Correct. To be very honest about it, I don't see why special conditions differ from the statements in the PSR. Why not have the judge read the entire RMPSR to the defendant? I mean, this, you know, he's supposed to handle this with counsel. I think in a perfect world, again, we agree with that for the reasons stated in our petition. Well, going back to the Texas Northern, Judge Barbara Lynn's practice is one you might take a hard look at. And they – because I think the U.S. Attorney's Office has a role to play in this as well, because of being sure that it gets complied with. But her practice is to have those conditions out in front of them. And then she interrogates the defendant as to whether or not he understands the plea and the lawyer have you explained to him and so forth. But then she goes to the next case and sends them out to one side with instructions to go over them with them. And she goes to the next case and then at the end of the day the case has come back and said, now have you read that, et cetera. So it's a practice you ought to take a look at because it works. Understood. We will review the argument transcript and review that practice as well. So the special conditions here included you must pay any financial penalty that is imposed by the judgment. Is that inconsistent with the judgment? It's – again, I think for us the simplest way to handle this at the end of this lengthy brief was just to concede across the board. And again, I'm not trying to back off her concession. I think – but arguably that's not a special condition and it's not something that conflicts with the judgment. There's a mandatory condition in the judgment that specifically requires the defendant to pay restitution. I don't think so. So I think conceding this particular condition out is – it's superfluous anyway. So what is the relief for this? The relief would just – I think the Court can simply accept our concession and send it back and strike them. And we can deal with it on our end. Send it back to the District Court to do what? The Court will strike them from the written judgment. But that's – I mean, that's problematic. It seems to me you may need to re-sentence because it said you must provide the probation officer with access to any requested financial information for purposes of monitoring restitution and employment. You must not incur new credit card charges, blah, blah, blah, without the approval of the probation officer. You must not participate in any form of gambling. All of that are obvious conditions to assist in the payment of some restitution. I mean, I think you're deprived of all monitoring unless you somehow get to re-sentence. Well, I think two points to that. I think under Rule 32.1c and Section 3583e, which we cited at the very end of our brief, I think we retain the ability to seek re-imposition of the conditions at any appropriate time. And I think that would include before supervised release begins and whenever – for Walter, 12 years. Did you give notice of restitution on the return of the indictment? I believe that we did, yes. But the second point I would make, too, is that the Court, again, not trying to back off a concession, but the Court does not have to accept it. It can independently review. I mean, there are any number of cases that stand for that proposition. The Court will undertake its own decision and its own analysis in this. I have a question on sufficiency. I think we started getting into questioning you, but you said Anita has both sides of the ledger. There's clear evidence of both sides of the ledger. For her, what about with Rosie? I don't see where Rosie had knowledge of what they were asking the government for. She was dealing on the level of – she knew what they were actually paying, these folks. Right. So what's your strongest evidence as to Rosie? The strongest evidence, and it's not something we've emphasized, I think, thoroughly enough in the brief, is this, that she also had signature authority over the church account, which is really important because the church account didn't have very much money in it at any given time. And you'll see that, I think, at – the page is escaping me, but it's – Agent Goodson testified about, for example, when the closeout money came into the church account. And the balance went from something like $10,000 to, you know, $135,000 all at once. Rosie would have seen – you know, she has signature authority over the account, so presuming she pays any attention to it at all, she's going to see all these excess funds coming into that account and then spilling out to each of the individual defendants. So she knows – and she's spending this money herself. She sees Walter, for example, spending $169,000 on his credit card bills from that account and on and on, the W.G. Diggles loan for $40,000 that was paid off from that account. She knows, you know, that that money has to be coming from somewhere. That is excess funds. So when you connect that up – and it's very important, I think, not a point I've emphasized sufficiently to this point, is that all this evidence has to be taken together. So you connect that up with the fact that, you know, we've mentioned this stonewalling episode. Rosie disagrees with us about that characterization, but I don't think she can deny that at minimum there was this interaction. Shana Fuller is coming to the Foundation's offices, and yes, she's generally dealing with Evelyn Cheatham, but she is coming to the Foundation's offices, Rosie being there one time, and saying, you know, I'm looking for records about how the Foundation is spending its money. And I think at that point Rosie, acting in good faith, would say, well, you know, we've actually been spending a whole bunch of this money ourselves, and I thought that was totally fine and we better get to the bottom of this. She doesn't say that at all. She just says, no, the records are not all available. I think we may not be here with Rosie but for her false statements to the agents. I mean, these were critical, I think, as well. So there isn't this, unlike with Walter and Anita, there's not this direct both sides of the ledger's point that we have, but we do have other circumstantial evidence of guilt. And those particular statements to Agent, I think it was to Agent Goodson or to Agent Rose, when Rosie says Walter had nothing to do with the Foundation other than providing advice when requested. Walter didn't control the Foundation. He wasn't involved in the reimbursements from DEDCOG to the Foundation. I mean, those are so directly contrary to the truth that the jury could say that's evidence of consciousness of guilt, that her role really in this was to keep her mouth shut, collect payments, and if somebody asked her about it, and notably her story is consistent with Walter's, the denial. It was Walter gave a statement to Agent Goodson and said to Agent Goodson, I didn't control the Foundation. I didn't control its payments. But, of course, that is totally false, as we know, from the memos that Walter sent to R.C. Horn directing R.C. Horn to make payments. And R.C. Horn, when asked to jump, he jumped, at least in that instance. Horn, by the way, I would say is, I think puppet is too strong a word, but his role in doing basically Walter's bidding is strong evidence of Walter's guilt, which we haven't really talked about too much. If the Court has any other specific questions, I'm happy to respond to those, but I would just otherwise just ask the Court to affirm the defendant's convictions. I think we have your argument. Thank you. Thank you. Okay, Mr. Rose. Ross, do you care to? Okay. No, I guess not. Thank you. All right. Mr. Bailey. Thank you, Your Honor. Just a couple of points. When the government talks about Ms. Rosie Diggles not dealing directly with Ms. Fuller, I've already addressed this in the reply brief. He was dealing with a lady named Ms. Evelyn, and he saw Ms. Rosie Diggles one time. There wasn't any reference to Ms. Rosie making any false statements, anything like that. All Ms. Fuller said was she didn't get all the records she wanted. With regards to what the government said about Ms. Diggles knowing that all these funds were going out, the evidence that I saw in the record represented that Mr. Diggles kept his business separate from Rosie Diggles. Rosie Diggles had a basic checking account. She had a credit card. She had a phone account. She dealt with those. But as far as knowing where all the funds were being spent, I don't think there's evidence in the record that shows she knew where it was being spent. And as far as the signature authority, it's not real clear in the record when she got that signature authority or she knew what she was signing. I mean, she was signing checks. She was trained as an accountant, right? She was trained as an accountant, but there's no evidence in the record that she ever reviewed any of the books or anything like that. All she had is signature authority on the account. That was the extent of her authority. With regards to the Rivas-Estrada issue, since Mr. Ross brought that case, I will tell you as a longtime practitioner in the Eastern District that prior to this, what the court would generally do is what happened in this case. They would refer to the PSR. Since then, and usually it's not 12 issues. Usually it's one to four special issues. What they do is they just simply read them into the record and go on. It's a very short process. It takes about 40 seconds. The court doesn't seem to have the concerns that Judge Higginbotham has with regards to that. I do agree with the government that they should be struck. Thank you. Well, thank you very much. Mr. Bailey and Mr. Ross, you were court appointed. You have done a great service for the court and for your clients, and we certainly appreciate your assistance.